

SIGNED.

Dated: October 20, 2011

*Randolph J. Haines*

**Randolph J. Haines, Bankruptcy Judge**
_____

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re ) | Chapter 11 |
| ) | |
| MORTGAGES LTD., ) | CASE NO. 2:08-bk-07465-RJH |
| ) | |
| Debtor. ) | |
| _____) | |
| ) | |
| JEFFREY C. STONE, INC. d/b/a SUMMIT ) | |
| BUILDERS, an Arizona corporation, ) | |
| ) | |
| Plaintiff, ) | ADVERSARY NO. 2:09-ap-00424-RJH |
| ) | |
| v. ) | |
| ) | |
| CENTRAL AND MONROE, L.L.C., an ) | |
| Arizona limited liability company; et al., ) | OPINION DENYING |
| ) | PARTIAL SUMMARY JUDGMENT |
| Defendants. ) | RE: MECHANICS' LIEN PRIORITY |
| _____) | |
| ) | |
| SUMMERS GROUP, INC. d/b/a REXEL ) | |
| PHOENIX ELECTRIC, a corporation, ) | |
| ) | |
| Cross-Claimant/Counter-Claimant, ) | |
| ) | |
| v. ) | |
| ) | |
| CENTRAL AND MONROE, L.L.C., an ) | |
| Arizona limited liability company; ) | |
| ) | |
| Cross-Defendants; and ) | |
| ) | |
| JEFFREY C. STONE, INC. d/b/a SUMMIT ) | |
| BUILDERS, an Arizona corporation, ) | |
| ) | |
| Counter-Defendant ) | |
| ) | |
| and related counterclaims and cross claims. ) | |
| _____) | |

The issue here is whether various mechanics' lien claimants, who claim priority dating from the commencement of construction in November 2006, have priority over a construction deed of trust that was recorded in May of 2007. Among other defenses, the construction lender asserts the doctrine of equitable subrogation gives it priority back to that of a prior deed of trust because a portion of the construction lender's loan was used to pay off the prior debt. And it argues that the second general contractor cannot claim a priority dating from the commencement of work by a prior general contractor.

**BACKGROUND FACTS**

The construction project at issue is the remodeling or refurbishment of an existing building commonly known as the Hotel Monroe. Its owner, Central and Monroe, LLC, first obtained a loan from First Commonwealth Mortgage Trust in the amount of $3.2 million, secured by a deed of trust recorded in May, 2002. In July, 2005, that loan was refinanced by an $8.5 million dollar loan provided by Mortgages Ltd., secured by a deed of trust recorded that same month. Almost $3 million of the proceeds of that loan were used to satisfy the First Commonwealth debt and obtain a release of the First Commonwealth deed of trust.

In December, 2006, the owner obtained a new loan from Choice Bank in the amount of $9.3 million. It was secured by a deed of trust recorded that same month. Approximately $7.3 million of the proceeds of the Choice loan were used to satisfy the debt to Mortgages Ltd. and obtain a release of its 2005 deed of trust.

By the time the Choice Bank deed of trust was recorded in December, 2006, however, work was already underway on the remodeling. KGM was the general contractor who had a contract with the owner in October, 2006, to perform demolition work. KGM asserts, and it is apparently undisputed, that KGM first supplied labor and materials to its construction project on November 15, 2006, more than a month prior to the recordation of the Choice Bank deed of trust.[1]

---

[1] As a general rule, Arizona law provides that all mechanics' and materialmen's liens have the same priority as of "the time labor was commenced." Arizona Revised Statutes ("A.R.S.") § 33-992(A).

The Choice Bank debt was refinanced by another loan from Mortgages Ltd. in the amount of $75.6 million, in May, 2007. The deed of trust securing that debt was recorded on May 16, 2007. From the proceeds of this second Mortgages Ltd. loan, more than $8.9 million was used to satisfy the Choice Bank debt and obtain a release of its 2006 deed of trust.

More than six months later, the owner signed another contract with another general contractor, Summit Builders. It commenced work on January 1, 2008, and recorded its notice and claim of mechanics' and materialmen's lien in July, 2008.

Summit claims that although it had a separate contract with the owner, some of the work it contracted to do was on the same "project" that KGM had worked on, the demolition of the interior of the building to prepare for the substantial remodeling.

**THE ISSUES**

Mortgages Ltd. has moved for summary judgment against Summit Builders and all of its subcontractors. Mortgages asserts that because portions of the proceeds of its loan were used to pay off prior secured debts, Mortgages Ltd is entitled to the priority of those prior deeds of trust under the doctrine equitable subrogation.

And even if Mortgages is not subrogated to the priority of the Choice deed of trust, it asserts that its own deed of trust is prior to Summit's liens, because Summit did not begin work until after recordation of Mortgages deed of trust and a second general contractor cannot claim priority back to the commencement of work by a prior general contractor, KGM. This could be called the "separate contract" theory, as distinguished from the "single project" theory of the priority of mechanic's liens.

**EQUITABLE SUBROGATION**

Probably the most accurate and authoritative statement of the doctrine of equitable subrogation as now recognized in Arizona is found in the 1965 Court of Appeals decision in *Peterman-Donnelly* :

> [A] third person, having agreed to advance money to discharge an encumbrance on property of another, where he is not a volunteer, and

> where payment is made under an agreement that he will be substituted in place of the holder of the encumbrance, is entitled to subrogation, whether such agreement is express or whether such agreement is implied.[2]

There is no dispute here that Mortgages Ltd. agreed to advance money to discharge the owner's obligation to Choice Bank. Nor is there any dispute that in doing so, Mortgages was not acting as a volunteer. Most of the argument has focused on the nature of the express or implied agreement that Mortgages would be substituted in place of Choice Bank as to lien priority.

Arizona case law seems to hold that the subsequent lender's intent to obtain first lien priority is sufficient evidence, standing alone, to satisfy the agreement requirement. In *Lamb*,[3] the Court of Appeals found sufficient evidence of the agreement to subrogate from the escrow closing instructions that required a title insurance policy showing the lender to have a valid first lien against the property. Those same facts exist here. It is significant that in *Lamb*, the trial court had denied equitable subrogation and granted summary judgment in favor of the lien claimants, but the Court of Appeals reversed based upon that escrow closing instruction. Summit's only argument on this point is that "the fact that ML required that a title insurance policy insure it for first lien position does not evidence the meeting of the minds required for an express or implied agreement." But that is essentially the holding of *Lamb*, that such an escrow requirement can provide sufficient evidence to satisfy the requirement of an implied agreement to subrogate.

But *Lamb* did not hold that such an escrow requirement itself satisfies the requirement of an agreement to subrogate. If the escrow requirement were conclusive, then the Court of Appeals would have remanded with instruction to enter judgment in favor of the lender. Instead, the Court of Appeals merely reversed the summary judgment that the trial court

---

[2] *Peterman-Donnelly Eng'rs and Contractors Corp. v. First Nat'l Bank of Ariz.*, 408 P.2d 841, 845 (Ariz. App. 1965).

[3] *Lamb Excavation Inc. v. Chase Manhattan Mortgage Corp.*, 95 P.3d 542 (Ariz. App. 2004).

had granted in favor of the lien claimants and remanded for "further proceedings consistent with this opinion."

Thus the holding of *Lamb* was that while an escrow instruction can provide some evidence of an implied agreement to subrogate, such evidence must be weighed with all other evidence of such an agreement or the lack of any such agreement.

This Court initially granted summary judgment for Mortgages Ltd. because the lien claimants had not responded to the motion with any evidence to the contrary. They have moved for rehearing, however, based on documents subsequently disclosed by Mortgages Ltd., which they contend provide evidence that there was no actual or implied agreement to subrogate. In particular, these subsequently disclosed documents reveal that the lender and its title company were not only well aware of the broken priority but also that they insisted upon obtaining "broken priority indemnity agreements" from the owner's principals before the loan would be funded and title insurance issued.

The insistence upon broken priority indemnity agreements, coupled with the absence of any attempt to obtain a written subrogation or assignment from the prior lender, provides very strong evidence that there was no actual or implied agreement to subrogate. Once the lender and its title company recognized the need to obtain some agreement to alleviate the risk of lending into a broken priority, it probably would have been much easier to obtain an assignment or subrogation agreement from the prior lender that is to be paid in full as part of the same transaction, than it would be to obtain an indemnity agreement from individuals, who would thereby assume a personal liability that they would not otherwise have. Moreover, the assignment or subrogation agreement would provide an absolute, impregnable defense to broken priority losses, at least to the extent of the prior loan, whereas the indemnity agreements would provide no such defense but merely provide a possible source of recovery once a loss had been incurred, very likely of doubtful collectability depending on the indemnitors' personal solvency. In other words, the existence of the indemnities strongly implies that Mortgages Ltd. never thought of subrogation. Since any agreement, whether express or implied, requires a meeting of

the minds, there can hardly be such an agreement on something at least one party never thought of.

At a minimum, the existence of the indemnity agreements constitutes evidence that there was no implied subrogation agreement that is at least as strong as, if not far stronger, than the evidence of such a subrogation agreement that is implied from an escrow instruction to which the prior lender was not a party. Such conflicting evidence cannot be weighed on summary judgment, so the only possible result is to deny summary judgment to the lender and set the matter for trial to hear all the evidence on whether there was an express or implied agreement to subrogate.

In this regard it is important to recognize that while the *Lamb* opinion stated that its description of the doctrine of equitable subrogation was consistent with that of the RESTATEMENT (THIRD) OF PROPERTY -- MORTGAGES § 7.6, *Lamb* did not eliminate Arizona's requirement of an express or implied agreement to subrogate. Indeed, it described the Restatement approach as an "even more liberal rule," which it then did not expressly adopt. The two more recent decisions from the Court of Appeals similarly repeated the requirement of "an express or implied agreement to subrogate."[4] And, as noted above, if *Lamb* had effectively eliminated the requirement of an agreement to subrogate, it would have been appropriate for the Court of Appeals to remand with instructions to enter judgment in favor of the lender, who had also moved for summary judgment and there apparently was no other evidence on the existence of such an agreement.[5]

There is also another reason why Mortgages may not be entitled to equitable subrogation on these facts. Another requirement is that there be no prejudice to the intervening lienholder. Here, Mortgages argues there is no prejudice to either KGM or Summit, because they retain the same priority they would have had with respect to the Choice or the first Mortgages deeds of trust.

---

[4] *Cont'l Lighting & Contracting, Inc. v. Premier Grading & Utils. LLC*, 258 P.3d 200, 203 (Ariz. App. 2011); *Sourcecorp Inc. v. Norcutt*, 258 P.3d 281, 285 P 14 (Ariz. App. 2011).

[5] *Lamb*, 95 P.3d 542.

While that might be true with respect to KGM, it is not so clearly true with respect to Summit. When Summit began work in January, 2008, the Choice deed of trust had been released and reconveyed as of May, 2007. Nothing of record put Summit on notice that Mortgages would claim to be subrogated to that released deed of trust. And because Summit knew that the work on the same demolition project it had been hired to do had been started by KGM in November, 2006, prior to both the Choice and the second Mortgages deeds of trust, from the constructive notice provided by the record, Summit was entitled to believe that the priority of its lien would relate back to November, 2006, prior to Mortgages' deed of trust that had been recorded when the Choice deed of trust was released, in May, 2007. Summit has a good argument that it would be prejudiced by the application of equitable subrogation. Such prejudice alone is a basis to deny equitable subrogation, under all tests.

Moreover, this is prejudice that Mortgages alone was in the position to avoid. When recording its own deed of trust, it could have given constructive notice that it was asserting a priority for at least a significant portion of its lien dating back to 2005.[6] In effect, Mortgages is asserting a secret lien priority which it was in a position to make public. Equitable subrogation is a equitable doctrine, but since at least 1601 equity does not favor the assertion of a secret lien.[7] Nor, between two innocent parties, does it favor the one who could have avoided the prejudice to the other. Indeed, at least one court has refused to apply equitable subrogation where the party claiming it could have, but failed to, give public notice in its deed of trust that it was asserting subrogation rights.[8]

---

[6] The Restatement of Property (Third) – Mortgages § 7.6 (1997), comment a, specifically recognizes the right and ability of a subrogee to record a public notice of its claim of subrogation rights.

[7] *Cf. Twyne's Case*, 3 Coke 80b, 76 Eng. Rep. 809 (Star Chamber 1601); A.R.S. § 44-1061 "[S]ecret liens, though sometimes permitted under the common law, have never been favored where rights were acquired at the cost of general creditors." *C.I.T. Corp. v. Seaney*, 85 P.2d 713, 716 (Ariz. 1938).

[8] *Land Title Ins. Corp. v. Ameriquest Mortgage Co.*, 207 P.3d 141, 145-46 (Colo. 2009) ("If a payor fails to timely record an interest it claims through equitable subrogation, that delay in recordation may bar enforcement of equitable subrogation rights when another party detrimentally relies on the state of title as recorded.").

Because there are factual issues as to the existence of an actual or implied agreement to subrogate, and as to the lack of prejudice or injustice to the other parties, Mortgages' motion for summary judgment must be denied.

**SEPARATE CONTRACT OR SINGLE PROJECT PRIORITY**

Mortgages has also moved for summary judgment as to Summit, because its deed of trust was recorded before Summit began work. Summit responds that because the demolition work was begun by KGM prior to Mortgages' deed of trust, the priority of Summit's lien relates back to the commencement of work by KGM. Both Mortgages and KGM argue that the relation back rule does not apply to work done under a different general contract with the owner.

The statutory language defining the priority of a mechanics lien has remained virtually unchanged since it was first adopted in1901. Currently, the statute reads, in pertinent part: "The liens provided for in this article . . . are preferred to all liens, mortgages or other encumbrances upon the property attaching subsequent to the time the labor was commenced . . . .".[9] That statutory reference to the commencement of "the labor" has at least three possible meanings: (1) it could mean the labor of only the particular lien claimant; (2) it could mean any labor under a particular general contract; or (3) it could mean any labor on the improvement.

In *Wylie*, the seminal case in Arizona, the Court adopted the second possible interpretation, holding that "when the building, structure, or improvement has been made under a general contract," then all liens arising from work done under that contract "are upon an equal footing."[10] "The one who furnishes the last item of material or does the last work on the building, structure, or improvement is in just as good shape as the one who did the first work or furnished the first material. Their right of lien relates to the same date."[11]

There was also extensive dictum in *Wylie* indicating that labor performed under separate, direct contracts with the owner would not share that same priority date, or indeed have any relation back. To a large extent this dictum was based on California cases. To some extent

---

[9] A.R.S. § 33-992(A).

[10] *Wylie v. Douglas Lumber Co.*, 8 P.2d 256, 259 (Ariz. 1932).

[11] *Id.*

it was based on an Arizona statutory provision that no longer exists, which expressly provided that all liens shall be on an equal footing regardless of the date of performing the labor or furnishing the material, which the Court held applied only to work performed or materials supplied under a general contract, not to work performed directly for the owner.

But the Court was very explicit that it was not deciding whether a relation-back rule applies to work done under a direct contract with the owner. On the facts before the Court, "all of the lien claimants have become such through the general contractor."[12] Therefore the Court had no occasion to determine the priority rules for liens arising either under different contracts or directly with the owner: "What the rule should be when the lienors have directly contracted with the owner and rendered services to him personally it will be time enough to decide when the facts present the question."[13]

Apparently that time has not come until now.

*Wahl*[14] applied the relation-back rule of *Wylie*, and in doing so quoted extensively from *Wylie*'s dictum regarding a potentially different priority rule for those contracting directly with the owner. But *Wahl* similarly had no occasion to decide that issue because "In the instant case the materials were furnished to the contractor, therefore, all the rights of the materialmen, including Ray Lumber, relate back to a date prior to" the recording of the mortgage, the date when each of the material men, with the exception of Ray Lumber, delivered materials.[15]

*Wooldridge* applied the relation-back principle to earthwork "when it has been performed as a part of the work required under a general contract for the construction of a building."[16] That Court also emphasized that it was not deciding whether "work done under

---

[12] *Id.* at 260.

[13] *Id.*

[14] *Wahl v. Sw. Sav. & L. Assoc.*, 476 P.2d 836 (Ariz. 1970).

[15] *Id.* at 840.

[16] *Wooldridge Const. Co. v. First Nat. Bank of Ariz.*, 634 P.2d 13, 19-20 (Ariz. App. 1981).

subsequent independent contractual arrangements directly with the owner"[17] would share the same priority.

But the analysis of *Wooldridge* is nonetheless significant for the matter at issue, because it correctly notes that "A.R.S. § 33-992 establishes priority for *all* of the liens provided for in the article on mechanic's liens."[18] That recognition is significant, because there is no language in A.R.S. § 33-992 suggesting that priority varies depending on the contract under which the work was done. Indeed, the word "contract" nowhere appears in A.R.S. § 33-992(A). And its priority rule hinges solely on "the time the labor was commenced." That language clearly implies there is only one such "time," not multiple times for different contracts. And the holding of *Wooldridge* means that that single date governs the priority "for *all* of the liens provided for in the article on mechanic's liens." In the absence of statutory language that "divided liens into two classes, those arising under a valid contract between the owner and the contractor, and those where the labor done and materials furnished were deemed to have been done and furnished at the personal instance of the owner,"[19] which was the basis for the California cases that gave rise to the *Wylie* dictum, there is no basis to give different priority dates to any liens governed by A.R.S. § 33-992(A).

Although it is not directly on point, this conclusion is further supported by the analysis in *S. K. Drywall*.[20] That case dealt with the date for perfecting a lien, rather than the priority date of a timely perfected lien. Liens must be filed "within one hundred twenty days after the completion of a building, structure or improvement."[21] The issue in *S.K. Drywall* was whether six buildings constituted a single project or "improvement." The court of appeals had relied on the "contractual arrangements between the parties," and the manner of construction, to

---

[17] *Id.* at 20.

[18] *Id.* (Emphasis in original).

[19] *Wylie*, 8 P.2d at 259.

[20] *S. K. Drywall, Inc. v. Developers Fin. Group, Inc.*, 819 P.2d 931 (Ariz. 1991).

[21] A.R.S. § 33-993(A). At the time of *S.K. Drywall*, this time period was sixty days. 819 P.2d at 934.

Case 2:09-ap-00424-EPB    Doc 415    Filed 10/20/11    Entered 10/21/11 09:09:52    Desc
Main Document - Notice of Filing    Page 10 of 13

10

conclude that the time to perfect ran from the completion of each building. The Supreme Court reversed, holding that the time runs from the completion of the "improvement," which is a "catch-all" term that refers to the subject of construction.[22]

While the priority rule of A.R.S. § 33-992 hinges on the time "the labor" was commenced rather than the "improvement" or the "project," it is logical to conclude that the legislature similarly was referring to the labor on a project, rather than the labor as defined by one contract or another.

Finally, although these conclusions can be reached based solely on the language of A.R.S. § 33-992(A), a more recent amendment to the statute in A.R.S. § 33-992(E) provides an independent basis for concluding that Summit's lien may have the same priority as KGM's. Paragraph (E) was apparently added to the statute in 2001. It provides a special priority rule for liens arising from improvements that are not governed by a contract for "the construction of any building or other structure."[23] This rule clearly applies to KGM's liens, since KGM was contracted only to provide demolition and asbestos remediation, not construction of a building or other structure. It also seems to apply to Summit's liens, because it was hired to do some demolition and remodeling, but not to construct any building.

If paragraph (E) governs both the KGM and Summit liens, then it is clear that the relation back rule applies on the basis of the "improvement," and for each such improvement the priority dates from the commencement of the work on that improvement. The paragraph provides, in pertinent part: "A lien arising from work or labor done or materials furnished for each improvement at the site attaches to property for priority purposes at the time labor was commenced or materials were commenced to be furnished pursuant to the contract between the owner and *original* contractor for that improvement to the site" (emphasis added).[24] And it defines "improvement at the site" to include "demolition or removal of improvements."

---

[22]*Id.* at 934.

[23] A.R.S. § 33-992(E).

[24] *Id.*

Summit has argued, in response to Mortgages' motion for summary judgment as to priority, that it was engaged to do some of the same work as KGM, which was primarily "demolition or removal of improvements." This may be a material factual dispute that will require evidence to resolve. But since the entire Hotel Monroe project was essentially a remodeling, it does seem incontrovertible that Summit was not hired to do any of the kinds of improvements identified in paragraph (E)(2), (3), (4) or (5) of A.R.S. § 33-992, nor was it hired to "construct a building or other structure."

So if Summit was engaged to do any work that falls within the broad category of "demolition or removal of improvements," then it was working on the same improvement as was KGM. And the language of paragraph (E) is clear and absolutely unambiguous that all the liens arising from the same kind of improvement that is not construction of a building have the same priority, and that priority dates from the commencement of labor by the "original" contractor, which is KGM. The statute's use of the term "original" clearly indicates that the statute contemplates there might be a subsequent independent contract for that same improvement, but that it does not get its own priority date simply because it was provided for by a separate contract.

The structure of paragraph (E) also suggests that for contracts that do involve the construction of a building, they also would share the same relation back rule among themselves, and their priority would date from the commencement of labor under the original contract. In other words, paragraph (E) adopts a project basis, rather than a contract basis, for its relation-back rule, suggesting that the relation-back rule for paragraph (A) would work the same. Conversely, the only circumstance where work under two separate contracts would get different priority dates would be when one of the contracts is only for non-construction improvements and the other is for construction improvements.

There does not appear to be any basis in the statute, as there might have been at the time of the *Wylie* dictum, to apply different priority dates for work under different contracts with the owner. To the contrary, the language and structure of A.R.S. § 33-992(A) all seem to imply there is a single priority date, which is the commencement of "the labor," with the

Case 2:09-ap-00424-EPB    Doc 415   Filed 10/20/11   Entered 10/21/11 09:09:52   Desc
Main Document - Notice of Filing    Page 12 of 13

12

1 | sole exception under A.R.S. § 33-992(E) for liens arising under a site preparation contact that is
2 | separate from a contract for the construction of a building.
3 | For these reasons, Mortgages' motion for summary judgment must be denied
4 | both as to KGM and as to Summit.

6 | DATED AND SIGNED ABOVE